IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff<br><br>                    v<br><br>BUSHROD BOONE,<br><br>           Defendant.<br>_____/ | No   CR-04-00372 VRW<br><br>ORDER |

Defendant Bushrod Boone ("Boone") seeks to suppress the evidence obtained by local law enforcement officers in a warrantless search of a San Francisco apartment. Doc #21 (Mot Supp). Boone claims that the search violated the Fourth Amendment to the United States Constitution. Mot Supp at 1. The government opposes. Doc #24 (Opp Supp). The court heard oral argument on these motions on July 12, 2005. Based on the parties' arguments and the applicable federal law, the court GRANTS Boone's motion to suppress.

//

I

On May 18, 2004, at approximately 11:14am, San Francisco Police Officer Darren Nocetti received a telephone call from a Confidential Reliable Informant ("CRI"). Opp Supp, Ex A (Nocetti Decl) at ¶ 3. Nocetti, a fourteen-year veteran assigned to the San Francisco Police Department Narcotics unit, was out of state at the time participating in a separate investigation. Nocetti Decl at ¶ 1-3. Nocetti testified that the CRI informed him that "a black male wearing a grey jacket had just brandished a Tec 9 Assault weapon at an unidentified victim." Id at ¶ 4. "Apparently, this was done in an effort to rob the unidentified victim." Id. The CRI explained that "he/she did not personally observe the individual brandish the Assault weapon * * *." Id at ¶ 5. Rather, "people told" the CRI that this individual, referred to as "Bushy-mo," "pulled a gun." Id. The CRI stated that he/she had been familiar with "Bushy-mo" for several years and observed "Bushy-mo" "with firearms on prior occasions." Id at ¶ 6-7. "Bushy-mo" would be identified after his arrest as Boone. Id at ¶ 7.

"Shortly after" the CRI was told that Boone had brandished an assault weapon, the CRI saw Boone and observed that he was wearing a grey jacket. Id at ¶ 8-9. Nocetti testified that the CRI "<u>followed</u> [Boone] into the apartment complex located at 565 Ellis Street." Id at ¶ 8 (emphasis added). In apparent contradiction, Nocetti also testified that the CRI "<u>did not follow</u> [Boone] inside the complex but kn[ew] that Boone visit[ed] Apartment #3 inside the units located 565 Ellis Street." Id at ¶ 10 (emphasis added).

Nocetti worked for at least five years with this

2

particular CRI, an eleven-year resident of the Tenderloin area of the City and County of San Francisco ("Tenderloin").  Id at ¶ 11, 15.  Nocetti testified that "this CRI ha[d] suffered felony convictions for possession of narcotics" and "was compensated financially for the information he/she provided regarding Boone's possession of the Assault weapon."  Id at ¶ 12, 16.  "However, this CRI has consistently provided reliable, trustworthy and accurate information on a number of occasions."  Id at ¶ 12.  Specifically, Nocetti stated that the information previously provided to him by this CRI "had resulted in at least five arrests," "was related to narcotics offenses" and "ha[d] always been accurate."  Id at ¶ 13.  Furthermore, "this CRI ha[d] worked with other San Francisco police officers providing them with credible information which has also led to numerous arrests."  Id at ¶ 14.

After speaking with the CRI at approximately 11:14am, Nocetti immediately contacted San Francisco Police Officer Richard O'Reilly, a ten-year veteran of the Tenderloin Task Force, who was working uniform patrol at the time.  Id at ¶ 17; Opp Supp, Ex C (O'Reilly Decl) at ¶ 3, 5.  Nocetti informed O'Reilly "that a black male, referred to as 'Bushy-mo,' wearing a grey jacket, last known to have entered 565 Ellis Street, unit #3, just brandished a Tec 9 Assault weapon at an unidentified victim."  Nocetti Decl at ¶ 18.  Nocetti further informed O'Reilly "that an individual fitting the same description was seen a week earlier brandishing a Tec 9 Assault weapon[;] [a]t that time, however, the individual's whereabout were unknown."  Id at ¶ 19.

O'Reilly testified that "Officer Nocetti said that Boone <u>had just entered</u> the apartment building at 565 Ellis Street and

3

entered room #3," Doc #23, Ex A (SFPD Incid Rep) at 6 (emphasis added).  In apparent contradiction, O'Reilly testified later that Nocetti told him that "[Boone] was believed to be located at 565 Ellis Street, apartment unit #3."  O'Reilly Decl at ¶ 6 (emphasis added).

O'Reilly immediately communicated this information to other officers in the area to assemble a response team.  O'Reilly Decl at ¶ 8.  It took O'Reilly approximately two minutes to arrive at 565 Ellis Street, where he met additional uniformed San Francisco Police Officers Jackson, Shin, Montero, Cesari, Recinos and Juarez.  Id at ¶ 9-10.  Able to gain access to 565 Ellis Street through the front door, these police officers ("the officers") proceeded to unit #3 ("the apartment").

The first officer to reach the apartment, O'Reilly "noticed that the door to the unit was slightly ajar and I could hear male and female voices coming from inside the unit."  Id at ¶ 11-12.  O'Reilly also noticed that the apartment hallway was "extremely narrow."  Id at ¶ 13.  O'Reilly was concerned that this placed the officers at a "tactical disadvantage"; "in the event that shots were fired, there would have been no means for us to escape or protect ourselves."  Id.  Furthermore, the officers did not know who legally resided in the apartment or where the individual they sought was located inside the apartment.  Id ¶ 14.  Considering the number of residents in the apartment building and the children's playground across the street, O'Reilly "regarded the individual who had brandished the Tec 9 Assault weapon as both a threat to the safety of the community as well as the officers."  Id at ¶ 15.

4

Because O'Reilly did not have a clear view of the interior of apartment, he "pushed the door open so that [he] could see inside the unit." Id at ¶ 16. With his weapon drawn, O'Reilly saw Christopher Easterling, whom he recognized from prior contacts he had with Easterling. Id at ¶ 16-17. O'Reilly testified that "Easterling saw me standing on the other side of the threshold to unit #3. I was in uniform and it was clear to me that Easterling knew who I was." Id at ¶ 21. O'Reilly did not know whether Easterling lawfully resided in the apartment or if Easterling was the individual who brandished the Tec 9 Assault weapon. Id at ¶ 20. O'Reilly knew, however, that Easterling had been convicted of numerous felony offenses and was affiliated with criminal street gangs. Id at ¶ 18. O'Reilly also knew that at the time Easterling was on probation with a warrantless search condition. Id at ¶ 19. Perceiving Easterling as a "danger especially if he were armed with an Assault weapon," O'Reilly ordered Easterling out of the apartment unit. Id at ¶ 22.

Within one minute, O'Reilly and his fellow officers detained Easterling and four additional subjects who had been in the apartment. Id at ¶ 23-24. While performing a protective sweep of the room for officer safety purposes, the officers found Boone hiding between a cupboard and the stove in the kitchen area and found another individual sleeping in the closet. Id at ¶ 25. Clearing Boone and this other individual from the room took an additional minute. Id at ¶ 26. Boone was wearing a grey jacket. Id at ¶ 27.

At this point, Officer Juarez, a weapons specialist, discovered the Tec 9 assault weapon. Id at ¶ 28. After scanning

5

the main room of the apartment, Juarez saw "what appeared to be the sling of a rifle" protruding from under a chair. Swanson Decl, Ex B (Incid Rep State). Juarez "immediately recognized the sling as a tactical rifle sling" and, after lifting the chair off the ground, found "what appeared to be an 'Intratec 9'" with a "magazine inserted in the magazine well." Id. Juarez stood watch over the weapon until O'Reilly relieved him. Id. Approximately six minutes elapsed from the time that O'Reilly first spoke to Nocetti to the time the apartment was secured. O'Reilly Decl at ¶ 30.

Following his arrest, Boone testified that until the time of his arrest, he had been a "frequent houseguest" at the apartment. Doc #22 (Boone Decl) at ¶ 2. From approximately one month prior to his arrest, Boone slept at the apartment as frequently as every other night and no less than twice a week. Id. An occupant of the apartment, Sammil Warren, allowed him to stay there. Id. Even when not in the apartment, Boone left personal items there -- including his radio, shoes and clothes -- with Warren's permission. Id at ¶ 3. When at the apartment alone, Boone had the ability to exclude others from and admit people into the apartment. Id at ¶ 4. Boone visited the apartment every day, ate meals there a few times a week and helped with chores in the apartment. Id at ¶ 5-7.

II

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause * * *." US

Const, Amend IV.  Because the Fourth Amendment protects "people, not places," see <u>Katz v United States</u>, 389 US 347, 351 (1967), a person claiming a Fourth Amendment violation must first demonstrate a "legitimate expectation of privacy" in the place searched or the thing seized.  <u>Rakas v Illinois</u>, 439 US 128, 143 (1978).  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  <u>Payton v New York</u>, 445 US 573, 586 (1980).

Accordingly, if claimant establishes a "legitimate expectation of privacy," he must next demonstrate that the alleged violator's conduct constituted a search for Fourth Amendment purposes.  "The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause <u>and</u> are presented with exigent circumstances."  Id at 590 (emphasis in original).  Thus, if the search was without a warrant, to prove a Fourth Amendment violation claimant must finally demonstrate that the alleged violator lacked <u>either</u> probable cause or exigent circumstances.

The court will address each issue in turn.

A

"[C]apacity to claim the protection of the Fourth Amendment depends * * * upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the <u>invaded place</u>."  <u>Minnesota v Carter</u>, 525 US 83, 88 (1998) (quoting <u>Rakas</u>, 439 US at 143) (emphasis added).  "A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable."  <u>Minnesota v Olsen</u>, 495 US

7

1  91, 95-96 (quoting <u>Rakas</u>, 439 US at 143-44).

2      Courts have established that an overnight guest has a
3  legitimate expectation of privacy for Fourth Amendment purposes.
4  "We need go no further than to conclude, as we do, that
5  [defendant's] status as an overnight guest is alone enough to show
6  that he had an expectation of privacy <u>in the home</u> that society is
7  prepared to recognize as reasonable."  <u>Olsen</u>, 495 US at 96-97
8  (emphasis added).  "[A]n overnight guest in another's home has a
9  reasonable expectation of privacy for purposes of Fourth Amendment
10 standing."  <u>United States v Gamez-Orduno</u>, 235 F3d 453, 458 (9th Cir
11 2000).

12     The government concedes that Boone had a "legitimate
13 expectation of privacy" in the apartment: "Pursuant to declaration,
14 Boone has proffered evidence which establishes his reasonable
15 expectation of privacy in 565 Ellis Street, Apartment unit #3."
16 Opp Supp at 4.  The government contends, however, that this issue
17 is not dispositive in determining whether Boone has standing to
18 raise a Fourth Amendment claim: "At issue here, however, is not
19 whether Boone had a legitimate expectation of privacy in the
20 contents of the apartment generally, but rather, whether he
21 reasonably believed the seized item -- the assault weapon -- would
22 remain private."  Id.  The government argues that "by placing the
23 firearm in a common room, accessible to several persons in plain
24 view, Boone did not manifest an expectation that the contraband or
25 firearm would remain free from public examination.  Accordingly,
26 his motion should fail."  Id at 6.

27     The court concludes that the government's argument has no
28 support in law.  First, Supreme Court precedent makes clear that an

United States District Court
For the Northern District of California

individual's "legitimate expectation of privacy" is "in the home" or "in the invaded place." See <u>Olsen</u>, 495 US at 95-97; <u>Carter</u>, 525 US at 88. Accordingly, because Boone has established himself as an overnight guest in the apartment, his privacy is in the apartment, not in the assault weapon.

Furthermore, the cases the government cites to support its argument are distinguishable from the present case. In <u>United States v Fay</u>, the Ninth Circuit held that defendant did not have a legitimate expectation of privacy in his bag located in the apartment in which he was staying, where the bag was open and readily accessible to anyone in the apartment. 410 F3d 589, 590 (9th Cir 2005). The government fails to recognize a key distinction: the police officers in <u>Fay</u> had obtained consent from the apartment owner to enter her apartment before they seized Fay's bag and firearm. See id at 589-90. In the present case, the government concedes that the search of the apartment in which Boone was an overnight guest was without consent. O'Reilly Decl at ¶ 16. Accordingly, the issue of Boone's legitimate expectation of privacy <u>in his firearm</u> is irrelevant in determining standing here.

The government similarly misapplies <u>United States v Katz</u>, 389 US 347 (1967). <u>Katz</u> held that "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Id at 351. The government argues that "by placing the firearm in a common room, accessible to several persons in plain view, Boone did not manifest an expectation that the contraband or firearm would remain free from

9

public examination." Opp Supp at 6.

The government's argument fails because it once again ignores a key distinction. In contrast to Katz, where the issue was an individual's expectation of privacy in a <u>public place</u>, Boone's firearm was <u>not</u> "exposed" or "accessible" to the public. Instead, Boone's firearm was only exposed to private individuals in the apartment. See <u>Recznik v City of Lorain</u>, 393 US 166, 168-69 (1968) ("[t]he congregation of a large number of persons in a private home does not transform it into a public place open to the police."). Only after police officers had pushed the apartment door open and entered the apartment were they able to view and access Boone's firearm. See O'Reilly Decl at ¶ 16, 28.

For the foregoing reasons, the court finds that Boone had a "legitimate expectation of privacy" in the apartment and thus, has standing to raise a Fourth Amendment claim.

B

Having established a "legitimate expectation of privacy," Boone argues next that the officers (1) conducted a search for Fourth Amendment purposes (2) without a warrant. The government concedes both of these issues. The government stated: "As an initial matter, the United States agrees that pushing open a door in order to view the interior of a residence constitutes a search." Opp Supp at 6. Furthermore, the government conceded that this search was conducted without a search warrant. See id at 9. For these reasons, the court turns to the final two issues.

//
//

C

"The Fourth Amendment prohibits police officers from making a warrantless entry into a person's home, unless the officers have probable cause <u>and</u> are presented with exigent circumstances." LaLonde v County of Riverside, 204 F3d 947, 954 (9th Cir 2000) (emphasis in original). Probable cause is established when there is "a fair probability that * * * evidence of a crime will be found in a particular place." Illinois v Gates, 462 US 213, 238 (1983). "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." Id at 232.

In the present case, the government asserts that the information provided by the CRI created probable cause to search the apartment. Opp Supp at 6-7. The Supreme Court has observed that "[i]nformants' tips doubtless come in many shapes and sizes from many different types of persons." Gates, 462 US at 232. In Gates, the Court advocated a totality-of-the-circumstances analysis; these circumstances include the informant's veracity or reliability and his basis of knowledge. Id. Under this analysis, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Id at 233.

In cases in which the informant is relying on hearsay, "an affidavit relying on hearsay is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented." Id at 241-42 (citations and quotations omitted). In the Ninth Circuit, where the basis of the informant's

11

knowledge is hearsay, "the hearsay must carry indicia of reliability both as to the veracity of the original source and the basis of the source's knowledge." United States v Angulo-Lopez, 791 F2d 1394, 1397 (9th Cir 1986).

The court finds that the officers had probable cause to search the apartment. The CRI's knowledge of the alleged crime was admittedly largely based on hearsay. Nocetti testified that the CRI "did not personally observe the individual brandish the Assault weapon"; rather, unidentified persons allegedly told the CRI that Boone had "pulled a gun." Nocetti Decl at ¶ 5. Moreover, Nocetti testified that the CRI did not have personal knowledge that Boone entered the apartment, because the CRI did not follow Boone into the complex. See id at ¶ 10.

Despite these facts, there were sufficient indicia of reliability both as to the veracity of the original source and the basis of the source's knowledge to corroborate the hearsay. The original source told the CRI that "a black male wearing a grey jacket had just brandished a Tec 9 Assault weapon at an unidentified victim." Nocetti Decl at ¶ 4. The original source referred to this individual as "Bushy-mo." Id at ¶ 5. Although the CRI did not observe this incident, he/she was personally aware of specific facts supporting the veracity of the original source's account. First, the CRI had been familiar with "Bushy-mo" for "several years" and had observed him "with firearms on prior occasions." Id at ¶ 6-7. Furthermore, shortly after speaking with the original source, the CRI observed "Bushy-mo" wearing a grey jacket entering 565 Ellis Street. Id at ¶ 8-9. In addition, the CRI had personal knowledge "that ["Bushy-mo"] visits Apartment #3."

12

1  Id at ¶ 10.

2  The CRI's (1) personal knowledge of Boone's past
3  possession of firearms, (2) corroboration of Boone's attire, (3)
4  observation of Boone entering 565 Ellis Street and (4) knowledge of
5  Boone's past visits to the apartment provide indicia of reliability
6  sufficient to meet the Angulo-Lopez standard.  See Angulo-Lopez,
7  791 F2d at 1397.  Because there is "a substantial basis for
8  crediting the hearsay," the second factor of the Gates totality of
9  the circumstances test -- the CRI's basis of knowledge -- is
10 satisfied.  See Gates, 462 US at 232-33, 241-42.

11 The government has also satisfied the first factor of the
12 Gates test -- the CRI's veracity or reliability.  The CRI had
13 "consistently provided reliable, trustworthy and accurate
14 information," leading to "at least five arrests."  Nocetti Decl at
15 ¶ 12-13.  According to the Ninth Circuit, "[i]f the informant has
16 provided accurate information on past occasions, he may be presumed
17 trustworthy on subsequent occasions."  See Angulo-Lopez, 791 F2d at
18 1397.  Boone contends that the financial compensation the CRI
19 received for the information he/she provided to Nocetti and the
20 CRI's felony record undermine the CRI's reliability.  Doc #26 (Rep
21 Opp) at 7.  See United States v Spach, 518 F2d 866, 870 (7th Cir
22 1975) ("Cases involving unnamed or paid informers are
23 distinguishable from cases involving informers who are victims of
24 crimes or citizens with no apparent motive to falsify
25 information.").

26 Boone cites no decision in this circuit, however, that
27 compensating an informant undermines the informant's reliability or
28 veracity.  On the contrary, the Ninth Circuit has found that

13

"[i]nformants often, if not usually, cooperate for money, and the fact that an informant has an ulterior or impure motive in coming forward to provide information to the police does not preclude a finding that the informant is nevertheless credible." United States v Meling, 47 F3d 1546, 1555 (9th Cir 1995). For the foregoing reasons, the court finds that the officers conducted their search with the belief that "a fair probability or substantial chance of criminal activity" existed. See United States v Alaimalo, 313 F3d 1188, 1193 (9th Cir 2002).

D

Although the court finds that the officers had probable cause to obtain a warrant, the lack of exigent circumstances in the present case renders the officers' warrantless search a violation of the Fourth Amendment. "'[A]bsent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within.'" Groh v Ramirez, 540 US 551, 559 (2004)(quoting Payton, 445 US at 587-88). Exigent circumstances exist where there is an "urgent need for immediate action." United States v Alvarez, 810 F2d 879, 881 (9th Cir 1987) (citations and quotations omitted). Exigencies include: "the need to protect an officer or the public from danger"; "the need to avoid the imminent destruction of evidence"; "when entry in 'hot pursuit' is necessary to prevent a criminal suspect's escape"; and "to respond to fires or other emergencies * * *." United States v Brooks, 367 F3d 1128, 1133 n5 (9th Cir 2004) (citations omitted).

"[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." LaLonde, 204 F3d at 956. The police can "meet that burden only by demonstrat[ing] specific and articulable facts to justify the finding of exigent circumstances." Id at 957 (citations and quotations omitted). "Furthermore, the presence of exigent circumstances necessarily implies that there is insufficient time to obtain a warrant; therefore, the government must show that a warrant could not have been obtained in time." United States v Reid, 226 F3d 1020, 1028 (9th Cir 2000) (citations and quotations omitted).

The court finds that there were no exigent circumstances justifying the officers' warrantless entry into the apartment. The government argues in vain that (1) the officers were in "hot pursuit" of the subject and (2) the officers and the public were in danger. Opp Supp at 9. First, there was clearly no "pursuit" in the present case. The CRI informed Nocetti that he had been told that "Bushy-mo" had brandished a gun at an unidentified person; the CRI observed Boone enter 565 Ellis Street; Nocetti contacted O'Reilly; O'Reilly contacted fellow officers, with whom he entered 565 Ellis Street and pushed open the apartment door. Nocetti Decl at ¶ 4-5, 18-19; O'Reilly at ¶ 8-12.

Although the government emphasizes that "all these events transpired within a matter of minutes," Opp Supp at 9, the officers alone created the alleged urgency of this situation. The government claims that "the officers were in hot pursuit of a suspect who had, moments earlier, brandished an assault weapon." Opp Supp at 9 (emphasis added). The facts do not support this

15

1 statement. Neither Nocetti nor O'Reilly indicated how much time
2 elapsed between the alleged crime and the CRI's observation of
3 Boone. See generally Nocetti Decl; O'Reilly Decl. Nor did the
4 officers' testimony reveal the duration between Boone's entrance
5 into 565 Ellis Street and the CRI's call to Nocetti. Id.

6 The period between Nocetti's conversation with the CRI
7 and the commencement of the officers' warrantless search could be
8 more accurately described as investigative communication. The
9 Ninth Circuit has held that "tracing of suspect through
10 investigative processes is not a case of hot pursuit, unless that
11 term is to be stretched beyond all reasonable meaning." See <u>United
12 Stated v George</u>, 883 F2d 1407, 1415 n5 (9th Cir 1989) (citations
13 and quotations omitted). Neither the CRI nor any of the officers
14 had witnessed Boone's alleged crime or pursued him to the
15 apartment. Accordingly, there was "no immediate or continuous
16 pursuit of the [defendant] from the scene of a crime" that would
17 establish "hot pursuit." See <u>Welsh v Wisconsin</u>, 466 US 740, 753
18 (1984).

19 Neither was there sufficient danger to the officers or
20 the public to constitute exigent circumstances. The government
21 attempts to establish "danger" by describing the <u>uncertainty</u> of the
22 situation: "the officers had <u>no knowledge</u> as to who the legal
23 resident of unit #3 was or the identity of the suspect at this
24 time; "the officers <u>were unaware</u> if anyone inside was being
25 threatened with the firearm or where the persons who possessed the
26 firearm was located inside the unit"; "[t]he officers had <u>no
27 indication</u> if the suspect intended harm to any of the unit's
28 occupants or if the suspect was lawfully inside unit #3." Opp Supp

16

at 8-9 (emphasis added). Rather than providing "specific and articulable facts" demonstrating danger, these statements demonstrate that the officers <u>lacked</u> specific knowledge of potential danger to them or the public. See <u>LaLonde</u>, 204 F3d at 957.

The only compelling facts that the government introduces to demonstrate danger took place <u>after</u> the officers commenced their warrantless search by pushing open the door to the apartment. Prior to the search, O'Reilly was concerned about the "tactical disadvantage" that the "narrow" hallway presented to the officers, and about the safety of the apartment building residents and children in the playground across the street. O'Reilly Decl at ¶ 13, 15. These concerns, however, were not based on specific evidence of danger. Not until opening the door and seeing former felon Easterling did O'Reilly determine, perhaps justifiably, that the situation was "dangerous to both law enforcement officers and members of the community." Opp Supp at 9.

The Ninth Circuit, however, has ruled that exigent circumstances caused by officers' actions do not justify a warrantless search. See <u>Hopkins v City of Sierra Vista</u>, 931 F2d 524, 527 (9th Cir 1991) ("The exigencies must be viewed from the totality of the circumstances known to the officers <u>at the time of the warrantless intrusion</u>.") (emphasis added); <u>United States v Driver</u>, 776 F2d 807, 810 (9th Cir 1985) ("The agents in this case would not have had to fear for their safety if they had not first entered the warehouse. Thus, the agents' search of the warehouse can only be excused if their initial entry was justified by exigent circumstances."). Accordingly, the officers cannot claim danger as

**17**

an exigent circumstance in the present case.

The Ninth Circuit's decision in <u>George</u> also counsels against a finding of exigent circumstances in the present case. In <u>George</u>, the suspect robbed two banks on the same day, shooting and injuring a security guard during the second robbery. 883 F2d at 1409. After positively identifying the suspect and discovering that the suspect had a history of violent behavior during his bank robberies, two officers proceeded to the suspect's apartment. Id at 1410. The officers pushed open the closed screen door without knocking or announcing their presence. Id. Finding the suspect holding a black object, the officers shot and arrested the subject. Id.

The Ninth Circuit held that there were no exigent circumstances justifying the officers' warrantless search in <u>George</u>. Id at 1414-15. The <u>George</u> court held:

> Suspects who are inside their homes and unaware of their impending arrests generally have no reason immediately to flee, * * * nor would they ordinarily have any reason immediately to destroy the fruits of their crime * * *. Likewise, without more there is little reason for them to endanger the lives of themselves or others. Consequently, law enforcement officers confronting this type of situation can, without great difficulty, maintain surveillance of the premises, * * * and either wait to effectuate a valid public arrest when the suspects emerge, * * * or seek an arrest warrant from a neutral and detached magistrate.

Id at 1413-14.

The court finds that the circumstances in the instant case present a less compelling case for exigent circumstances than those in <u>George</u>. As in <u>George</u>, the government has provided no evidence demonstrating that Boone was aware of his impending

arrest. Unlike Boone, the suspect in <u>George</u> had already harmed someone. Furthermore, as a group of seven officers in the hallway outside the apartment, O'Reilly and his team had an even greater opportunity than the two officers in <u>George</u> to conduct surveillance while also pursuing an arrest warrant. Accordingly, the government's argument for exigent circumstances in the present case is unpersuasive.

Because there was no "hot pursuit" or apparent danger to the officers or public, the court finds that no exigent circumstances justified the officers' warrantless search of the apartment.

### III

The court finds that Boone had a "legitimate expectation of privacy" protected by the Fourth Amendment that the government violated when it conducted a warrantless search without exigent circumstances. Accordingly, the court GRANTS Boone's motion to suppress the fruits of the government's unlawful search, including: the firearm discovered by the officers; the photographs taken by the officers; the jacket seized by the officers; and the statements made by the individuals arrested during the search, including Janice McDonald, Shakira Robertson, Sammil Warren, Charles Adams and Christopher Easterling.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge